Filed 10/24/22; Certified for Publication 11/21/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF FINANCE et al., | C092139 |
| Plaintiffs, Cross-defendants and Appellants, | (Super. Ct. No. 34201080000604CUWMGDS) |
| v. | |
| COMMISSION ON STATE MANDATES, | |
| Defendant and Respondent; | |
| COUNTY OF SAN DIEGO et al., | |
| Defendants, Cross-complainants and Appellants. | |

The California Constitution requires the state to provide a subvention of funds to compensate local governments for the cost of a new program or higher level of service mandated by the state.  (Cal. Const., art. XIII B, § 6 (Section 6).)  Subvention is not

1

available if the local governments have the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or higher level of service.  (Gov. Code, § 17556, subd. (d) (section 17556 (d)).)  Defendant and respondent Commission on State Mandates (the Commission) adjudicates claims for subvention.  (Gov. Code, §§ 17525, 17551.)

This appeal concerns whether Section 6 requires the state to reimburse the defendant local governments (collectively permittees or copermittees) for costs they incurred to satisfy conditions which the state imposed on their stormwater discharge permit.  The Commission determined that six of the eight permit conditions challenged in this action were reimbursable state mandates.  They required permittees to provide a new program.  Permittees also did not have sufficient legal authority to levy a fee for those conditions because doing so required preapproval by the voters.

The Commission also determined that the other two conditions requiring the development and implementation of environmental mitigation plans for certain new development were not reimbursable state mandates.  Permittees had authority to levy a fee for those conditions.

On petitions for writ of administrative mandate, the trial court in its most recent ruling in this action upheld the Commission's decision in its entirety and denied the petitions.

Plaintiffs, cross-defendants and appellants State Department of Finance, the State Water Resources Board, and the Regional Water Quality Board, San Diego Region (collectively the State) appeal.  They contend the six permit conditions found to be reimbursable state mandates are not mandates because the permit does not require permittees to provide a new program and permittees have authority to levy fees for those conditions without obtaining voter approval.

Defendant, cross-complainant, and appellant permittees cross appeal.  They contend the other two conditions found not to be reimbursable state mandates are

reimbursable because permittees do not have authority to levy fees for those conditions. Specifically, they cannot develop fees that would meet all constitutional requirements for an enforceable fee.[1]

The Commission has filed a respondent's brief. As part of its brief, it claims it erred in concluding that part of one of the challenged conditions, which mandates street sweeping, was a reimbursable mandate. The Commission now agrees with the State that permittees have authority to levy a fee to recover the cost of complying with that condition and it is not reimbursable under Section 6.

Except to hold that the street sweeping condition is not a reimbursable mandate, we affirm the judgment.

FACTS AND PROCEEDINGS

For a fuller discussion of the stormwater discharge permitting system and the constitutional mandate subvention system, please see the discussion in *Department of Finance v. Commission on State Mandates* (2017) 18 Cal.App.5th 661, 668-675 (*San Diego Mandates I*). For our purposes, it is sufficient to state that the federal Clean Water Act (33 U.S.C. § 1251 et seq.) prohibits pollutant discharges into the nation's waters unless they comply with a permit, established effluent limitations, or standards of performance. The Clean Water Act created the National Pollutant Discharge Elimination System (NPDES) to permit water pollutant discharges that comply with all statutory and administrative requirements. (*San Diego Mandates I,* at pp. 668-669.)

Pursuant to federal approval granted under the Clean Water Act, California under the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) operates the

---

[1] The permittees are the County of San Diego and the Cities of Carlsbad, Chula Vista, Coronado, Del Mar, El Cajon, Encinitas, Escondido, Imperial Beach, La Mesa, Lemon Grove, National City, Oceanside, Poway, San Diego, San Marcos, Santee, Solana Beach, and Vista.

NPDES permitting system and regulates discharges within the state under state and federal law. (*San Diego Mandates I, supra*, 18 Cal.App.5th at pp. 669-670.)

The Clean Water Act requires an NPDES permit for any discharge from a municipal separate storm sewer system (MS4) serving a population of 100,000 or more. (33 U.S.C. § 1342 (p)(2)(C), (D).) " '[A] permit may be issued either on a system- or jurisdiction-wide basis, must effectively prohibit non-stormwater discharges into the storm sewers, and must "require controls to reduce the discharge of pollutants to the maximum extent practicable." (33 U.S.C. § 1342 (p)(3)(B), italics [omitted].)' " (*San Diego Mandates I, supra*, 18 Cal.App.5th at p. 670.)

In 2007, the Regional Water Quality Control Board, San Diego Region (San Diego Regional Board), issued an NPDES permit to permittees for the operation of their MS4. (*San Diego Mandates I, supra*, 18 Cal.App.5th at p. 670.) "The permit was actually a renewal of a nation pollutant discharge elimination system (NPDES) permit first issued in 1990 and renewed in 2001. The San Diego Regional Board stated the new permit 'specifies requirements necessary for the Co-permittees to reduce the discharge of pollutants in urban runoff to the maximum extent practicable (MEP).' The San Diego Regional Board found that although the permittees had generally been implementing the management programs required in the 2001 permit, 'urban runoff discharges continue to cause or contribute to violations of water quality standards. This [permit] contains new or modified requirements that are necessary to improve Co-permittees' efforts to reduce the discharge of pollutants in urban runoff to the MEP and achieve water quality standards.'

"The permit requires the permittees to implement various programs to manage their urban runoff that were not required in the 2001 permit. It requires the permittees to implement programs in their own jurisdictions. It requires the permittees in each watershed to collaborate to implement programs to manage runoff from that watershed, and it requires all of the permittees in the region to collaborate to implement programs to

4

manage regional runoff. The permit also requires the permittees to assess the effectiveness of their programs and collaborate in their efforts.

"The specific permit requirements involved in this case require the permittees to do the following:

"(1) As part of their jurisdictional management programs:

"(a) Sweep streets at certain times, depending on the amount of debris they generate, and report the number of curb miles swept and tons of material collected;

"(b) Inspect, maintain, and clean catch basins, storm drain inlets, and other stormwater conveyances at specified times and report on those activities;

"(c) Collaboratively develop and individually implement a hydromodification management plan to manage increases in runoff discharge rates and durations;

"(d) Collectively update the best management practices requirements listed in their local standard urban stormwater mitigation plans (SUSMP's) and add low impact development best management practices for new real property development and redevelopment;

"(e) Individually implement an education program using all media to inform target communities about [MS4s] and impacts of urban runoff, and to change the communities' behavior and reduce pollutant releases to MS4s;

"(2) As part of their watershed management programs, collaboratively develop and implement watershed water quality activities and education activities within established schedules and by means of frequent regularly scheduled meetings;

"(3) As part of their regional management programs:

"(a) Collaboratively develop and implement a regional urban runoff management program to reduce the discharge of pollutants from MS4s to the maximum extent practicable;

"(b) Collaboratively develop and implement a regional education program focused on residential sources of pollutants;

"(4) Annually assess the effectiveness of the jurisdictional, watershed, and regional urban runoff management programs, and collaboratively develop a long-term effectiveness assessment to assess the effectiveness of all of the urban runoff management programs; and

"(5) Jointly execute a memorandum of understanding, joint powers authority, or other formal agreement that defines the permittees' responsibilities under the permit and establishes a management structure, standards for conducting meetings, guidelines for workgroups, and a process to address permittees' noncompliance with the formal agreement.

"The permittees estimated complying with these conditions would cost them more than $66 million over the life of the permit." (*San Diego Mandates I, supra*, 18 Cal.App.5th at pp. 670-672, fn. omitted.) (We note the parties and the trial court consolidated four of the conditions stated above into two for purposes of their arguments, resulting in a total of eight challenged conditions instead of ten. They considered the requirements to sweep streets and clean stormwater conveyances as one condition and the two requirements for developing educational programs as one condition. For purposes of consistency and argument, we will assume there are the same eight challenged permit conditions before us, although we will discuss the street sweeping condition separately.)

In 2008, permittees filed a test claim with the Commission to seek subvention under Section 6 for the eight challenged conditions. In 2010, the Commission issued its ruling. It first determined that the challenged conditions were not federal mandates. Subvention is not available if the state imposes a requirement that is mandated by the federal government, unless the state mandates costs that exceed those incurred under the federal mandate. (Gov. Code, § 17556, subd. (c).)

6

Relevant here, the Commission further determined that six of the eight challenged conditions, all of the conditions except the two requiring development of a hydromodification management plan and low impact development requirements, were reimbursable state mandates. The permit required permittees to provide a new government program of abating water pollution, and the permit conditions were unique to governmental agencies. The Commission also determined that permittees did not have authority to levy fees for complying with the six conditions because such fees would require voter approval under the state constitution. However, permittees had authority to levy fees to recover costs for the other two conditions. Permittees had police power to levy such fees as well as statutory authority to levy development fees, and because those fees would be imposed only on new real property development, they were not subject to voter approval. As a result, the Commission found that those two conditions were not reimbursable state mandates.

The State filed a petition for writ of administrative mandate against the Commission's decision. Permittees filed a cross-petition. The trial court found that the Commission had applied the wrong test in determining whether the challenged conditions were federal mandates. (*San Diego Mandates I, supra*, 18 Cal.App.5th at pp. 674-675.) In *San Diego Mandates I*, a panel of this court reversed the trial court's judgment, held that the Commission had applied the correct test, and concluded the challenged permit conditions were not federal mandates. Because the trial court had rested its judgment exclusively on the federal mandates ground, we remanded the matter so the trial court could consider the parties' other arguments for and against the Commission's decision. (*Id*. at pp. 667-668.)

The trial court on remand upheld the Commission's decision in its entirety and denied both petitions for writ of mandate. It found that six of the conditions were reimbursable mandates, and the hydromodification management plan and low impact development conditions were not. The NPDES permit mandated permittees to provide a

7

new program for purposes of Section 6, permittees lacked authority to levy fees to pay for the six conditions, and permittees had authority to levy fees for the other two conditions.

The State contends the trial court erred. It asserts the permit did not mandate a new program, and permittees have authority to levy fees for the six permit conditions. In their cross-appeal, permittees contend the trial court erred, and that they do not have fee authority for the other two conditions. The Commission claims that contrary to its and the trial court's rulings, the street sweeping condition is not a reimbursable mandate because permittees have authority to levy fees for that condition.

DISCUSSION

I

*Law of the Case and Standard of Review*

In *San Diego Mandates I*, this court stated that the permit conditions were state mandates. (*San Diego Mandates I, supra*, 18 Cal.App.5th at pp. 667, 684-689.) However, the doctrine of law of the case does not apply because whether the conditions were state mandates was not essential to our decision in *San Diego Mandates I.* (*Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 498.) Concluding the conditions were state mandates was premature since the only issue determined by the trial court and resolved by us was whether the conditions were federal mandates. Our determining the conditions were not federal mandates did not result in the conditions automatically being reimbursable state mandates, and, thus, stating they were state mandates was not necessary to our decision. We recognized these points because we remanded for the trial court to address the other issues raised by the parties which neither we nor the trial court had addressed. (*San Diego Mandates I,* at p. 668.) Those issues included whether the conditions were a new program or higher level of service for purposes of Section 6 and whether the permittees had fee authority to fund the conditions.

8

(*San Diego Mandates I,* at p. 674.)  The trial court addressed those issues on remand, and the parties have fully briefed them.  We now address those issues on their merits.

Whether a statute or executive order imposes a reimbursable mandate under Section 6 is a question of law.  We review the entire record before the Commission and independently determine whether it supports the Commission's conclusion that six conditions here were reimbursable state mandates and two were not.  (*Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749, 762 (*Los Angeles Mandates I*).)

## II

### *New Program*

Under Section 6, if the state by statute or executive order requires a local government to provide a "new program" or a "higher level of service" in an existing program, it must "provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service[.]"  (Section 6, subd. (a); *County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 201.)

For purposes of Section 6, a "program" refers to either " '[(1)] programs that carry out the governmental function of providing services to the public, or [(2)] laws which, to implement a state policy, impose unique requirements on local governments and do not apply generally to all residents and entities in the state.' [Citation.]"  (*San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859, 874 (*San Diego Unified*).)  The term "higher level of service" refers to " 'state mandated increases in the services provided by local agencies in existing "programs." ' "  (*Ibid.*)

The Commission and the trial court determined that the permit conditions constituted a new program for purposes of Section 6 because the conditions satisfied both definitions of a program.  First, they required permittees to implement a new program of

9

providing pollution abatement services to the public in addition to the stormwater drainage services.

Second, the conditions also imposed unique requirements on permittees regarding how they would provide the required pollution abatement services. The State required permittees to reduce water pollution by implementing best management practices to the maximum extent practicable, a standard that purportedly applies exclusively to government entities and not to all other state residents or entities who must also obtain NPDES permits to discharge into the nation's waters. The latter entities who obtain NPDES permits must satisfy numeric effluent limitations.

Neither the Commission nor the trial court determined whether the permit conditions triggered subvention under Section 6 on the ground that they required permittees to provide a higher level of service in an existing program.

The State claims the conditions are not a new program for purposes of Section 6. We agree with the trial court and the Commission that the permit conditions required permittees to provide a new program. Permittees were providing stormwater drainage systems, and the permit required them to provide a new program of water pollution abatement services in forms which permittees had not provided before and which benefited the public.

The State contends the permit conditions do not satisfy the definitions of a new program under Section 6. Regarding the first definition of a program, carrying out the governmental function of providing services to the public, the State argues that the permit conditions were not imposed to provide a service to the public; they were imposed to enforce a general ban on pollution. Federal and state laws prohibit all persons, including municipalities that discharge stormwater and urban runoff, from discharging pollutants from point sources into waters of the United States without an NPDES permit. (33 U.S.C. §§ 1311(a), 1342, 1362(5); 40 C.F.R. §§ 122.21, 122.22, 123.25; Wat. Code, §§ 13376, 19, 13050, subd. (c).) Thus, permittees had to obtain a permit because they

10

discharge pollution, not because they are local governments. Local governments that do not discharge pollutants into United States waters are not required to have a permit.

The distinction the State attempts to draw is not persuasive. The State cites no authority for the proposition that a mandatory permit condition cannot constitute a reimbursable mandate under Section 6 because it is imposed to enforce a government ban on pollution. Section 6 requires reimbursement whenever any state law or executive order mandates a new program on a local government. Nothing in the constitutional requirement distinguishes between new programs imposed directly by law and new programs imposed as a condition of a required regulatory permit.

Indeed, when the Legislature attempted to exclude NPDES permit conditions from Section 6's scope by statute, the court of appeal held the statute was unconstitutional. Originally, the statutory definition of an "executive order" for purposes of Section 6 expressly excluded any order or requirement issued by the State Water Board or any regional water boards pursuant to the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.), such as an NPDES permit. (Gov. Code, former § 17516, subd. (c) [Stats. 1984, ch. 1459, § 1].) The court of appeal in *County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, held that the statutory exclusion of NPDES permit conditions imposed on local governments was contrary to the express terms of Section 6 and thus unconstitutional. "This exclusion of any order issued by any Regional Water Board contravenes the clear, unequivocal intent of article XIII B, [S]ection 6 that subvention of funds is required '[w]henever . . . *any state agency* mandates a new program or higher level of service on any local government . . . .' " (*County of Los Angeles v. Commission on State Mandates*, at p. 920, fn. omitted.) Section 6 requires subvention whether the new program is imposed directly by law or as a condition of a regulatory permit required by a state agency.

The court of appeal reached the same conclusion in *Department of Finance v. Commission on State Mandates* (2021) 59 Cal.App.5th 546 (*Los Angeles Mandates II*).

11

The State argued there that NPDES permit conditions to require trash receptacles at transit stops and to inspect business sites were not a new program for purposes of Section 6 because they were imposed to prevent pollution, not to provide a public service. The court disagreed: "This view . . . ignores the terms of the Regional Board's permit; the challenged requirements are not bans or limits on pollution levels, they are mandates to perform specific actions—installing and maintaining trash receptacles and inspecting business sites—that the local governments were not previously required to perform. Although the purpose of requiring trash collection at transit stops and business site inspections was undoubtedly to reduce pollution in waterways, the state sought to achieve that goal by requiring local governments to undertake new affirmative steps resulting in costs that must be reimbursed under section 6." (*Id*. at p. 560.) So it is here.

Continuing to assert that the NPDES permit does not impose a new program, the State argues the trial court ignored a distinction for purposes of Section 6 between a law that requires local governments to provide a public service and one that regulates conduct and applies to local governments because they choose to engage in that conduct. For example, as opposed to requiring a local government to sweep streets at regular intervals (which would be a mandated program), when the state requires a local government to sweep streets as a condition of operating an MS4 that discharges pollutants, the state is regulating the local government as a polluter, not requiring it to provide a public service. That is because the permit does not require permittees to operate an MS4. If they choose to operate one, they must mitigate pollutant discharges, like all other polluters. Because the permit implements a general law that applies to all polluters, public and private, and because permittees chose to develop an MS4, the State claims the permit does not require permittees to provide a new public service or program.

Generally, "if a local government participates 'voluntarily,' i.e., without legal compulsion or compulsion as a practical matter, in a program with a rule requiring increased costs, there is no requirement of state reimbursement." (*Department of*

*Finance v. Commission on State Mandates* (2009) 170 Cal.App.4th 1355, 1365-1366.) However, that "an entity makes an initial discretionary decision that in turn triggers mandated costs" does not by itself preclude reimbursement under Section 6. (*San Diego Unified, supra*, 33 Cal.4th at pp. 887-888.) The discretionary decision may have been the result of compulsion "as a practical matter."

Being compelled "as a practical matter" may arise, among other instances, when an entity or its constituents face certain and severe penalties or consequences for not participating in or complying with an optional state program. For example, in *City of Sacramento v. State of California* (1990) 50 Cal.3d 51 (*City of Sacramento*), the California Supreme Court determined that a state statute that required state and local governments to provide unemployment insurance benefits to their employees for the first time was a federal mandate and not a reimbursable state mandate. The case is instructive here for describing how a local government could be mandated or compelled as a practical matter to provide a service. The federal government had not required the state to enact the statute, but if the state did not enact it, state private employers would lose a federal tax credit and would face double unemployment taxation by the state and federal governments. (*Id*. at pp. 58, 74.) Much of cost-producing federal influence on state and local governments is "by inducement or incentive rather than direct compulsion." (*Id*. at p. 73.) California could have terminated its own unemployment insurance system to eliminate the double taxation, but the Supreme Court could not imagine that the drafters and adopters of article XIII B and Section 6 intended to force the state "to such draconian ends." (*City of Sacramento,* at p. 74.) The alternatives to not adopting the statute "were so far beyond the realm of practical reality that they left the state 'without discretion' to depart from federal standards." (*Ibid*.)

Here, the alternative to not obtaining an NPDES permit was for permittees not to provide a stormwater drainage system. If permittees chose to operate an MS4, they were required by the State to obtain a permit. (33 U.S.C. § 1342 (p)(2)(C), (D).) While

13

permittees at some point in the past chose to provide a stormwater drainage system, "[t]he drainage of a city in the interest of the public health and welfare is one of the most important purposes for which the police power can be exercised." (*New Orleans Gaslight Co. v. Drainage Com. of New Orleans* (1905) 197 U.S. 453, 460.) In urbanized cities and counties such as permittees, deciding not to provide a stormwater drainage system is no alternative at all. It is "so far beyond the realm of practical reality" that it left permittees "without discretion" not to obtain a permit. (*City of Sacramento, supra*, 50 Cal.3d at p. 74.) Permittees were thus compelled as a practical matter to obtain an NPDES permit and fulfill the permit's conditions. Permittees " '[did] not voluntarily participate' in applying for a permit to operate their stormwater drainage systems; they were required to do so under state and federal law and the challenged requirements were mandated by the Regional Board." (*Los Angeles Mandates II, supra*, 59 Cal.App.5th at p. 561).)

Despite the State's emphasis on the point, it is irrelevant to our analysis that both public and private parties who discharge pollution from point sources into waters must obtain an NPDES permit to do so. "[T]he applicability of permits to public and private discharges does not inform us about whether a particular permit or an obligation thereunder imposed on local governments constitutes a state mandate necessitating subvention under article XIII B, [S]ection 6." (*County of Los Angeles v. Commission on State Mandates, supra*, 150 Cal.App.4th at p. 919.) What matters is that permittees were compelled by state law to obtain a permit and comply with its conditions, including the provision of a different public program—water pollution abatement.

The State argues that even if the permit conditions mandate a program, the program is not new. As required by the Clean Water Act, this permit and permittees' two prior permits required permittees to prohibit non-stormwater discharges into their MS4s and to reduce the discharge of pollutants in stormwater from MS4s to the maximum extent practicable. (33 U.S.C. § 1342 (p)(3)(B)(ii), (iii).) New permit conditions did not

14

change that obligation. The State claims that a condition that did not appear in prior permits or has been updated to require additional expenditures is not new because it does not increase permittees' underlying obligation to eliminate or reduce the discharge of pollutants from their MS4s to the maximum extent practicable. Rather, the condition ensures compliance with the same standard that has applied since 1990 when permittees obtained their first permit.

The application of Section 6, however, does not turn on whether the underlying obligation to abate pollution remains the same. It applies if any executive order, which each permit is, required permittees to provide a new program or a higher level of existing services. (Gov. Code, § 17514.) Exercising its discretionary authority with each permit, the State imposed specific conditions it found were necessary in order for permittees to satisfy the maximum extent practicable standard. If those conditions required permittees to provide a new program or to increase services in an existing program, they triggered Section 6.

To determine whether a program imposed by the permit is new, we compare the legal requirements imposed by the new permit with those in effect before the new permit became effective. (See *San Diego Unified, supra*, 33 Cal.4th at p. 878; *Lucia Mar Unified School Dist. v. Honig* (1988) 44 Cal.3d 830, 835.) This is so even though the conditions were designed to satisfy the same standard of performance.

Here, it is without dispute that the challenged permit conditions impose new requirements when compared to the prior permit. Because those new requirements constitute a new program for purposes of Section 6, Section 6 requires the State to reimburse permittees for the costs of the new program, subject to certain exceptions discussed next.

Because we have determined that the challenged permit conditions required permittees to provide a new program for purposes of Section 6, we need not address the parties' arguments under the second definition of a program, whether the permit

15

conditions impose unique requirements on local governments to implement a state policy that do not apply generally to all residents and entities in the state. Nor need we discuss arguments concerning whether the permit conditions required permittees to provide a higher level of existing services.

III

*State's Appeal Regarding Fee Authority*

Even if a statute or executive order requires a local government to provide a new program, the mandate does not require subvention under Section 6 if the local government "has authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service." (Section 17556(d)).)

Section 6's subvention for "costs" excludes expenses that are recoverable from sources other than taxes. (*County of Fresno v. State of California et al.* (1991) 53 Cal.3d 482, 488.) "Section 6 was included in article XIII B in recognition that article XIII A of the Constitution severely restricted the taxing powers of local governments. [Citation.] The provision was intended to preclude the state from shifting financial responsibility for carrying out governmental functions onto local entities that were ill equipped to handle the task. [Citations.] Specifically, it was designed to protect the tax revenues of local governments from state mandates that would require expenditure of such revenues. Thus, although its language broadly declares that the 'state shall provide a subvention of funds to reimburse . . . local government for the costs [of a state-mandated new] program or higher level of service,' read in its textual and historical context [S]ection 6 of article XIII B requires subvention only when the costs in question can be recovered *solely from tax revenues*." (*County of Fresno v. State of California et al.,* at p. 487.)

The Commission and the trial court determined that whether permittees had authority to levy fees for the eight conditions depended on whether fees for stormwater drainage services would have to be preapproved by the voters under article XIII D of the

state constitution. The Commission and the trial court found that six of the eight challenged permit conditions were reimbursable mandates because permittees did not have the authority to levy a fee for those conditions that was not subject to voter preapproval. The other two challenged conditions requiring the creation and implementation of a hydromodification management plan and low impact development requirements for certain new development were not reimbursable mandates because permittees could levy a fee for those conditions without voter approval.

The State contends in its appeal that the Commission and the trial court erred in determining the six challenged conditions were reimbursable. Despite published authority holding otherwise at the time, the State claims that fees to fund stormwater drainage systems were not subject to voter approval under article XIII D. According to the State, the published authority was wrongly decided, and a later-enacted statute declaring that fees for stormwater drainage services were not subject to voter approval applies here. The State argues that even if the fees were subject to voter approval, permittees still had authority to levy the fees regardless.

In its briefing, the Commission agrees with the State that, contrary to its earlier decision, the condition requiring street sweeping would be within permittees' fee authority as it would not be subject to voter approval.

A.    Background

Permittees have authority pursuant to their constitutional police powers to levy regulatory and development fees. (Cal. Const., art. XI, § 7.) "[P]revention of water pollution is a legitimate governmental objective, in furtherance of which the police power may be exercised." (*Freeman v. Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408.)

However, the state constitution imposes procedural and substantive requirements on property-related fees adopted by local governments. Article XIII D, enacted by the

17

voters in 1996 as part of Proposition 218 (as approved by voters, Gen. Elec. (Nov. 5, 1996), subjects all fees imposed by a local government upon a parcel or upon a person as an incident of property ownership, including a user fee for a property-related service, to a two-step approval process. (Cal. Const., art. XIII D, §§ 1, 6.) The first step is a property owner protest procedure. If a majority of the affected property owners file a written protest against the proposed fee, "the agency shall not impose the fee or charge." (*Id.*, § 6, subd. (a)(2).)

The second step requires the proposed fee to be approved by the voters. If a property owner protest does not succeed, a property-related fee must be approved by either a majority of the property owners subject to the fee or by a two-thirds vote of the electorate residing in the affected area. (Cal. Const., art. XIII D, § 6, subd. (c).) Of significance here, this voter approval requirement is subject to exceptions. The requirement does not apply to "fees or charges for *sewer*, water, and refuse collection services[.]" (*Ibid.*, italics added.) And no part of article XIII D, including its owner protest and voter approval requirements, applies to fees levied on real property development or fees that result from a property owner's voluntary decision to seek a government benefit. (Cal. Const., art. XIII D, § 1; *Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 425-428.)

In the test claim and after determining permittees had authority under their police power to impose fees for the permit conditions, the Commission had to determine whether permittees had sufficient authority to levy a fee for purposes of section 17556(d) if the fee first had to be approved by voters under article XIII D. Relying on *Howard Jarvis Taxpayers Assn. v. City of Salinas* (2002) 98 Cal.App.4th 1351 (*City of Salinas*), a decision by the Sixth Appellate District, the Commission determined that a fee to fund six of the eight permit conditions (all of the conditions except those requiring creation of a hydromodification plan and low impact development requirements) was required to be preapproved by the voters under article XIII D. The fee would be a property-related fee,

18

and it would not be exempt from the voter approval requirement as a fee for sewer or water services.

In *City of Salinas*, the court of appeal determined that a fee to fund a city's program to bring its stormwater drainage system into compliance with the Clean Water Act was not a sewer or water fee for purposes of article XIII D, and thus was required to be adopted by voters. (*City of Salinas, supra*, 98 Cal.App.4th. at pp. 1356-1358.) The court of appeal determined the word "sewer" as used in article XIII D was ambiguous and could not be interpreted under the plain meaning rule. (*City of Salinas,* at p. 1357.) The court interpreted the term "sewer services" as excluding stormwater drainage systems and as narrowly referring to "sanitary sewerage" which carries "putrescible waste" from residences and businesses and discharges it into the sanitary sewer line for treatment. (*Id*. at p. 1358, fn. 8.)

Because under *City of Salinas* a fee to fund stormwater drainage systems did not constitute a fee for sewer or water services and was thus subject to voter preapproval under article XIII D, the Commission determined that fees for the six permit conditions would also be subject to voter approval under article XIII D. Further, the voter approval requirement denied permittees sufficient authority to levy a fee for purposes of section 17556(d). As a result, the six conditions were reimbursable state mandates under Section 6.

The Commission also reasoned that denying reimbursement for those six conditions would defeat the purpose of Section 6. It was possible that permittees' voters would never approve the proposed fee, but permittees would still be required to comply with the state mandate.

The Commission applied a different analysis to the condition requiring street sweeping. The Commission found that a fee to fund street sweeping was expressly exempt from article XIII D's voting requirement because it was a fee for refuse collection. However, such a fee would still be subject to article XIII D's owner protest

19

procedure. On that basis, the Commission determined permittees did not have sufficient authority to levy a fee to recover the costs of the street sweeping condition, and it was thus a reimbursable mandate.

Approximately seven months after the Commission issued its decision in March 2010, the Legislature broadened the scope of section 17556(d). The amendments, enacted by Senate Bill No. 856 (2009-2010 Reg. Sess.) (Sen. Bill 856), and effective October 19, 2010, declared that section 17556(d)'s prohibition of reimbursement under Section 6 if the local agency can fund the mandated costs through fees or assessments "applies regardless of whether the authority to levy charges, fees, or assessments was enacted or adopted prior to or after the date on which the statute or executive order was enacted or issued." (Stats. 2010, ch. 719, § 31; Gov. Code, § 17556, subd. (d).)

Sen. Bill 856 also provided a procedure to address the effect of newly enacted fee authority. The statute authorizes the state and local agencies to request the Commission to adopt a new test claim decision due to a subsequent change in law that modifies the state's liability for that test claim under Section 6. (Stats. 2010, ch. 719, § 33; Gov. Code, § 17570, subds. (b), (c).) If the Commission adopts a new test claim decision, it may revise the subvention requirements effective as of the fiscal year preceding the fiscal year in which the request for redetermination was filed. (Gov. Code, § 17570, subd. (f).)

More than seven years after the Commission issued its decision, the Legislature enacted legislation to overrule *City of Salinas*. It adopted Senate Bill No. 231 (2017-2018 Reg. Sess.) (Sen. Bill 231), in which the Legislature for the first time defined a "sewer" for purposes of article XIII D and defined it to include stormwater drainage systems. (Stats. 2017, ch. 536, § 1; Gov. Code § 53750, subd. (k), part of the Proposition 218 Omnibus Implementation Act (Gov. Code, § 53750 et seq., added by Stats. 1997, ch 38, eff. July 1, 1997) (the Implementation Act).)

Enacting Sen. Bill 231, the Legislature stated the court in *City of Salinas* disregarded the plain meaning of "sewer." (Gov. Code, § 53751, subds. (e), (f).) The

common meaning of "sewer services" was not "sanitary sewerage." (Gov. Code, § 53751, subd. (g).) Numerous sources predating the enactment of article XIII D defined "sewer" as more than just sanitary sewers and sanitary sewerage. One source was Public Utilities Code section 230.5, enacted in 1970. Sen. Bill 231's definition of sewer mirrored that statute's definition. (Gov. Code, § 53751, subd. (i).)

Sen. Bill 231 states: "The Legislature reaffirms and reiterates that the definition found in Section 230.5 of the Public Utilities Code is the definition of 'sewer' or 'sewer service' that should be used in the Proposition 218 Omnibus Implementation Act." (Gov. Code, § 53751, subd. (l).) "Sewer" should be interpreted to include services necessary to dispose surface or storm waters. (Gov. Code, § 53751, subd. (m).)

At trial, the State contended that Sen. Bill 231 overturned *City of Salinas*, and that under the new statute, fees for the six conditions were sewer fees exempt from voter approval under article XIII D, and thus within permittees' authority to levy. The trial court disagreed. It stated that even if Sen. Bill 231 overturned *City of Salinas*, it found "nothing 'mistaken' about the Commission's reliance on that case when it issued its decision. The Commission issued its decision in 2010, and it was not free to disregard relevant case law—including [*City of Salinas*]—on the theory that the Legislature might change that law in the future. [Sen. Bill 231] was enacted in 2017 and went into effect January 1, 2018. How can a law that went into effect in 2018 retroactively invalidate a decision issued in 2010? The State never addresses this question, and the short answer is that it cannot."

The State attempted to argue Sen. Bill 231 was retroactive in a supplemental brief, but the trial court found the argument was insufficient to rebut the presumption that statutes operate prospectively only. The court stated that Sen. Bill 231 " 'cannot retroactively apply to invalidate the Commission's decision' and 'cannot form the basis for a writ reversing [that decision].' "

21

B.    Analysis

The State contends that fees for the six permit conditions do not require voter approval; thus, permittees have authority to levy such fees, and, as a result, under section 17556(d), Section 6 does not require the State to reimburse permittees for the costs incurred to comply with the six conditions. The fees do not require voter approval because the Commission's authority that they do require voter approval, *City of Salinas*, was wrongly decided, and we should not follow it. That court expressly disregarded the plain meaning of the term "sewer" as including storm sewers. The Legislature in Sen. Bill 231 criticized *City of Salinas* on that point and declared the plain meaning of "sewer" was to include storm drainage systems.

The State also argues that Sen. Bill 231 and its definition of "sewer" govern this case. The Legislature adopted Sen. Bill 231 to clarify the meaning of "sewer" in article XIII D. Statutes that clarify existing law or are retroactive apply to cases such as this that were pending and in which no final judgment had been entered when the statute was enacted. Additionally, the State argues that under Sen. Bill 856's amendment to section 17556(d), newly adopted fee authority such as Sen. Bill 231 applies to this case.

The State further argues that even if fees to fund the challenged permit conditions are subject to voter approval, that fact does not deprive permittees of adequate authority to adopt fees for purposes of Section 6. For authority to support this argument, the State relies on *Paradise Irrigation Dist. v. Commission on State Mandates* (2019) 33 Cal.App.5th 174 (*Paradise Irrigation Dist.*), in which a panel of this court held that article XIII D's owner protest procedure did not deprive a local agency of authority to impose a property-related fee, and thus the mandated expenses in that case were not reimbursable due to section 17556(d). (*Paradise Irrigation Dist.,* at pp. 194-195.) The state argues the same reasoning should apply to article XIII D's voter approval requirement.

22

The Commission agrees with the State on one point: its determination that the street sweeping condition was a reimbursable mandate and the trial court's affirmance of that finding should be reversed. A fee for this condition is exempt from article XIII D's voter approval requirement because the fee would be for refuse collection. On that basis, and also because this court in *Paradise Irrigation Dist.* determined that article XIII D's owner protest procedure did not deny a local government of authority to levy a fee, the Commission agrees with the State that permittees have authority to levy a fee to recover the costs of street sweeping, and the condition is thus not a reimbursable mandate under Section 6.

### 1.    Definition of "sewer" at the time of the Commission's decision

We are asked to interpret the term "sewer" as that term was used in the exemption of fees for sewer services from article XIII D's voter approval requirement at the time the Commission issued its decision. (Cal. Const., art. XIII D, § 6, subd. (c).) We do not dispute permittees' point that under stare decisis the Commission and the trial court were required to follow *City of Salinas* when they made their decisions. However, while they may have been bound by *City of Salinas* at the time they ruled, we are not. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Even without considering Sen. Bill 231, we may disagree with *City of Salinas* and not apply it in this direct appeal if we find it unpersuasive. (See *County of Kern v. State Dept. of Health Care Services* (2009) 180 Cal.App.4th 1504, 1510.) Nonetheless, we reach the same holding, setting aside for the moment Sen. Bill 231's possible application.

" 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If

23

the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.]  "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165-166.)" (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617 (*City of San Jose*).)

We apply these same principles to interpreting voter initiatives, except we do so to determine the voters' intent.  (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037.)  We turn first to the initiative's language, giving the words their ordinary meaning as understood by "the average voter." (*People v. Adelmann* (2018) 4 Cal.5th 1071, 1080.)  " 'The [initiative's] language must also be construed in the context of the statute as a whole and the [initiative's] overall . . . scheme.' (*People v. Rizo* (2000) 22 Cal.4th 681, 685.)  'Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language.' (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 543.)  Where there is ambiguity in the language of the measure, '[b]allot summaries and arguments may be considered when determining the voters' intent and understanding of a ballot measure.' (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 673, fn. 14.)" (*Professional Engineers in California Government v. Kempton,* at p. 1037.)  Ambiguities in initiatives may also be resolved by referring to "the *contemporaneous* construction of the Legislature." (*Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197, 203, italics added.)

24

Systems that collect water from a residence's toilets and sinks and treat the waste water at a water treatment plant are commonly referred to as sewers or sanitary sewers. (*City of Salinas, supra*, 98 Cal.App.4th at p. 1357.) Stormwater drainage systems usually deposit stormwater into the surface waters of the state. These are commonly referred to as storm sewers, storm drains, "storm drain systems," and "storm sewer systems." (*Los Angeles Mandates I, supra*, 1 Cal.5th at pp. 754, 757.) The question is whether voters intended the word "sewer" in article XIII D to exempt fees for only sanitary sewers or both sanitary and stormwater sewers from the measure's voting requirement.

We may look to dictionary definitions to determine the usual and ordinary meaning of a statutory term. (*MCI Communications Services, Inc. v. California Dept. of Tax & Fee Admin.* (2018) 28 Cal.App.5th 635, 644.) Dictionary definitions of "sewer" indicate the word can refer to both sanitary sewers and storm drainage systems. The Merriam-Webster's Unabridged Dictionary defines a sewer as "a ditch or surface drain" or "an artificial usually subterranean conduit to carry off water and waste matter (such as surface water from rainfall, household waste from sinks or baths, or waste water from industrial works)." (Merriam-Webster Unabridged Dict. Online (2022) <https://unabridged.merriam-webster.com/unabridged/sewer, par.3> [as of Aug. 23, 2022], archived at: <https://perma.cc/EKA3-6ETL>.)

The Oxford English Dictionary defines sewer as an "artificial watercourse for draining marshy land and carrying off surface water into a river or the sea," and an "artificial channel or conduit, now usually covered and underground, for carrying off and discharging waste water and the refuse from houses and towns." (Oxford English Dict. Online (2022) <https://www.oed.com/view/Entry/176971?rskey=EtxAX4&result=1&isAdvanced=false #eid, par.1> [as of Aug. 23, 2022], archived at: <https://perma.cc/V4XG-YDVS>.)

But we do not start and end statutory interpretation with dictionary definitions. "[T]he 'plain meaning' rule does not prohibit a court from determining whether the literal

25

meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute.  The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible.  [Citation.]  Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute.  The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

Analyzing Proposition 218's use of the word "sewer" in context renders its meaning clear.  In the initiative, we find a clause - the measure's only other use of the word "sewer" - in which the voters distinguished the word "sewer" from a  drainage system.  Section 4 of article XIII D established procedures and voter approval requirements for creating assessments.  Section 5 of article XIII D imposed those requirements on all existing, new, or increased assessments with exceptions.  Of relevance here, one of the exempt existing assessments is:  "Any assessment imposed exclusively to finance the capital costs or maintenance and operation expenses for sidewalks, streets, *sewers*, water, flood control, *drainage systems* or vector control." (Cal. Const., art. XIII D, § 5, subd. (a), italics added.)

If possible, we construe statutes and constitutional provisions to give meaning to every word, phrase, sentence, and part of an act.  (*City of San Jose, supra*, 2 Cal.5th at p. 617.)  Thus, when the Legislature, or in this case the voters, use different words in the same sentence, we assume they intended the words to have different meanings.  (*K.C. v. Superior Court* (2018) 24 Cal.App.5th 1001, 1011, fn. 4.)  By using "sewers" and "drainage systems" in the same sentence, the voters intended the words to have different meanings.  Were it not so, the use of the terms to convey the same meaning would render them superfluous, an interpretation courts are to avoid.  (*Klein v. United States of America* (2010) 50 Cal.4th 68, 80.)

Additionally, under the maxim *expressio unius est exclusio alterius*, "[w]hen language is included in one portion of a statute, its omission from a different portion addressing a similar subject suggests that the omission was purposeful," and that the Legislature intended a different meaning. (*In re Ethan C.* (2012) 54 Cal.4th 610, 638; *Klein v. United States of America, supra*, 50 Cal.4th at p. 80.)

Section 5 of article XIII D addresses "sewers" and "drainage systems," but section 6 of article XIII D, the section that contains the exemption from the measure's voter approval requirement, exempts only fees for sewer, water, and refuse collection services. It does not exempt fees for drainage systems. Storm drainage systems generally are a means to provide surface water drainage. (See *Biron v. City of Redding* (2014) 225 Cal.App.4th 1264, 1269.) And although article XIII D and the Implementation Act at the time of the Commission's decision did not define "sewer," the Implementation Act did define a "drainage system" as "any system of public improvements that is intended to provide for erosion control, for landslide abatement, or for *other types of water drainage.*" (Gov. Code, § 53750, subd. (d), italics added.) Given that the voters intended to differentiate between "sewers" and "drainage systems," and that storm drainage systems provide water drainage, we conclude the voters did not intend the exemption of "sewer" service fees from article XIII D's voter-approval requirement to include fees for stormwater drainage systems

This interpretation is strengthened by Proposition 218's purposes. The voters adopted Proposition 218 to "limit[] the methods by which local governments exact revenue from taxpayers without their consent." (Prop. 218, § 2, reprinted at 1 Stats. 1996, p. A-295.) To that end, the voters declared that the measure's provisions "shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Prop. 218, § 5, reprinted at 1 Stats. 1996, p. A-299.)

Thus, required as we are to interpret any exception to the measure's purpose narrowly, we conclude, based on a contextual and narrow reading of the exception of fees

for sewer services and not drainage services, that the term sewer in the voter approval exception provision of article XIII D's section 6 referred only to sanitary sewers at the time of the Commission's decision. Because we have determined the term's meaning is clear in its context, we need not rely on other interpretive aids. (*Lungren v. Deukmejian, supra*, 45 Cal.3d at p. 735.)

### 2. Sen. Bill 231

Having determined that article XIII D's exception of sewer fees from voter approval did not include fees for stormwater drainage systems at the time of the Commission's decision, we must determine the effect, if any, of Sen. Bill 231. The State contends the statute applies to this case either as a clarification of existing law or as a retroactive statute.

### a. Background

Following the enactment of Proposition 218, the Legislature enacted the Implementation Act to prescribe specific procedures and parameters for local jurisdictions in complying with the initiative. (Gov. Code, § 53750 et seq.; Leg. Counsel's Dig., Sen. Bill No. 218 (1997-1998 Reg. Sess.) Stats. 1997.) Government Code section 53750 (section 53750), part of the Implementation Act, defined terms used in articles XIII C and XIII D. At the time of its enactment in 1997, section 53750 did not include a definition of the term "sewer." (Stats. 1997, ch. 38, § 5.) An amendment to the statute in 1998 also did not define the term. (Stats. 1998, ch. 876, § 10.)

After *City of Salinas* was decided, the Legislature amended section 53750 in 2002. This legislation was filed with the Secretary of State three months after the court of appeal filed *City of Salinas*. (Stats. 2002, ch. 395; *City of Salinas, supra*, 98 Cal.App.4th 1351.) Yet again, the Legislature did not add a definition of the word "sewer" to the statute. (Stats. 2002, ch. 395, § 3.) Another amendment in 2014 also did not define the term. (Stats. 2014 ch. 78, § 2.)

In 2017, 15 years after *City of Salinas* was published, the Legislature enacted Sen. Bill 231 to define "sewer" in article XIII D and to overrule *City of Salinas*. Sen. Bill 231 amended section 53570 by defining "sewer," for purposes of article XIII D's exemption of sewer fees from its voter approval requirement, to include stormwater drainage systems. "Sewer" includes "systems, all real estate, fixtures, and personal property . . . to facilitate sewage collection, treatment, or disposition for sanitary or drainage purposes, including . . . sanitary sewage treatment or disposal plants or works, drains, conduits, outlets for surface or storm waters, and any and all other works, property, or structures necessary or convenient for the collection of sewage, industrial waste, or surface or storm waters." (Gov. Code, § 53750, subd. (k).)

Also as part of Sen. Bill 231, the Legislature enacted a new statute, Government Code section 53751 (section 53571), to overrule *City of Salinas*.[2] The Legislature

---

[2] Section 53751 reads in full: "The Legislature finds and declares all of the following:

"(a) The ongoing, historic drought has made clear that California must invest in a 21st century water management system capable of effectively meeting the economic, social, and environmental needs of the state.

"(b) Sufficient and reliable funding to pay for local water projects is necessary to improve the state's water infrastructure.

"(c) Proposition 218 was approved by the voters at the November 5, 1996, statewide general election. Some court interpretations of the law have constrained important tools that local governments need to manage storm water and drainage runoff.

"(d) Storm waters are carried off in storm sewers, and careful management is necessary to ensure adequate state water supplies, especially during drought, and to reduce pollution. But a court decision has found storm water subject to the voter-approval provisions of Proposition 218 that apply to property-related fees, preventing many important projects from being built.

"(e) The court of appeal in [*City of Salinas, supra*,] 98 Cal.App.4th 1351 concluded that the term 'sewer,' as used in Proposition 218, is 'ambiguous' and declined to use the

29

statutory definition of the term 'sewer system,' which was part of the then-existing law as Section 230.5 of the Public Utilities Code.

"(f) The court in [*City of Salinas, supra,*] 98 Cal.App.4th 1351 failed to follow long-standing principles of statutory construction by disregarding the plain meaning of the term 'sewer.' Courts have long held that statutory construction rules apply to initiative measures, including in cases that apply specifically to Proposition 218 (see *People v. Bustamante* (1997) 57 Cal.App.4th 693; *Keller v. Chowchilla Water Dist.* (2000) 80 Cal.App.4th 1006). When construing statutes, courts look first to the words of the statute, which should be given their usual, ordinary, and commonsense meaning (*People v. Mejia* (2012) 211 Cal.App.4th 586, 611). The purpose of utilizing the plain meaning of statutory language is to spare the courts the necessity of trying to divine the voters' intent by resorting to secondary or subjective indicators. The court in [*City of Salinas, supra,*] 98 Cal.App.4th 1351 asserted its belief as to what most voters thought when voting for Proposition 218, but did not cite the voter pamphlet or other accepted sources for determining legislative intent. Instead, the court substituted its own judgment for the judgment of voters.

"(g) Neither the words 'sanitary' nor 'sewerage' are used in Proposition 218, and the common meaning of the term 'sewer services' is not 'sanitary sewerage.' In fact, the phrase 'sanitary sewerage' is uncommon.

"(h) Proposition 218 exempts sewer and water services from the voter-approval requirement. Sewer and water services are commonly considered to have a broad reach, encompassing the provision of clean water and then addressing the conveyance and treatment of dirty water, whether that water is rendered unclean by coming into contact with sewage or by flowing over the built-out human environment and becoming urban runoff.

"(i) Numerous sources predating Proposition 218 reject the notion that the term 'sewer' applies only to sanitary sewers and sanitary sewerage, including, but not limited to:

"(1) Section 230.5 of the Public Utilities Code, added by Chapter 1109 of the Statutes of 1970.

"(2) Section 23010.3, added by Chapter 1193 of the Statutes of 1963.

"(3) The Street Improvement Act of 1913.

"(4) *L.A. County Flood Control Dist. v. Southern Cal. Edison Co.* (1958) 51 Cal.2d 331, where the California Supreme Court stated that 'no distinction has been made between sanitary sewers and storm drains or sewers.'

criticized the *City of Salinas* court for "disregarding the plain meaning of the term 'sewer' " and "substitute[ing] its own judgment for the judgement of the voters." (Gov. Code, § 53751, subd. (f).) The Legislature found that sewer and water services are commonly considered to include "the conveyance and treatment of dirty water, whether

---

"(5) Many other cases where the term 'sewer' has been used interchangeably to refer to both sanitary and storm sewers include, but are not limited to, *County of Riverside v. Whitlock* (1972) 22 Cal.App.3d 863, *Ramseier v. Oakley Sanitary Dist.* (1961) 197 Cal.App.2d 722, and *Torson v. Fleming* (1928) 91 Cal.App. 168.

"(6) Dictionary definitions of sewer, which courts have found to be an objective source for determining common or ordinary meaning, including Webster's (1976), American Heritage (1969), and Oxford English Dictionary (1971).

"(j) Prior legislation has affirmed particular interpretations of words in Proposition 218, specifically Assembly Bill 2403 of the 2013-14 Regular Session (Chapter 78 of the Statutes of 2014).

"(k) In *Crawley v. Alameda Waste Management Authority* (2015) 243 Cal.App.4th 396, the Court of Appeal relied on the statutory definition of 'refuse collection services' to interpret the meaning of that phrase in Proposition 218, and found that this interpretation was further supported by the plain meaning of refuse. Consistent with this decision, in determining the definition of 'sewer,' the plain meaning rule shall apply in conjunction with the definitions of terms as provided in Section 53750.

"(l) The Legislature reaffirms and reiterates that the definition found in Section 230.5 of the Public Utilities Code is the definition of 'sewer' or 'sewer service' that should be used in the Proposition 218 Omnibus Implementation Act.

"(m) Courts have read the Legislature's definition of 'water' in the Proposition 218 Omnibus Implementation Act to include related services. In *Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586, the Court of Appeal concurred with the Legislature's view that 'water service means more than just supplying water,' based upon the definition of water provided by the Proposition 218 Omnibus Implementation Act, and found that actions necessary to provide water can be funded through fees for water service. Consistent with this decision, 'sewer' should be interpreted to include services necessary to collect, treat, or dispose of sewage, industrial waste, or surface or storm waters, and any entity that collects, treats, or disposes of any of these necessarily provides sewer service."

31

that water is rendered unclean by coming into contact with sewage or by flowing over the built-out human environment and becoming urban runoff." (Gov. Code, § 53571, subd. (h).) The Legislature cited to numerous statutes and cases that it claimed rejected the notion that "sewer" applies only to sanitary sewers. (Gov. Code, § 53751, subd. (i).)

Section 53751 declared that the plain meaning rule shall apply when interpreting the definitions set forth in section 53750. (Gov. Code, § 53751, subd. (k).) The statute concluded, "The Legislature reaffirms and reiterates that the definition found in Section 230.5 of the Public Utilities Code is the definition of 'sewer' or 'sewer service' that should be used in the Proposition 218 Omnibus Implementation Act. . . . '[S]ewer' should be interpreted to include services necessary to collect, treat, or dispose of sewage, industrial waste, or surface or storm waters, and any entity that collects, treats, or disposes of any of these necessarily provides sewer service." (Gov. Code, § 53751, subds. (l), (m).)

b. Analysis

The State contends Sen. Bill 231 applies here because this matter was pending as of the statute's enactment, and the Legislature intended the statute either to be a clarification of existing law or to apply retroactively to all pending cases.

Permittees and the Commission argue Sen. Bill 231 does not apply here because the Legislature adopted the statute to change the law, and it did not clearly express its intent that the measure applied retroactively. They also claim the statute does not apply because at the time the Commission made its decision in this matter, it was required to follow *City of Salinas*, and the Commission's decision is now final.

Initially, we disagree with the Commission and permittees that Sen. Bill 231 cannot apply here because the Commission's decision is final. That argument confuses administrative finality with finality that binds parties to a fully litigated final judgment. The Commission's decision was administratively final and thus subject to judicial review.

32

However, to be final so as to be binding on the parties and immune from retroactive or clarifying legislation, the decision must be free from direct attack by a petition for writ of administrative mandate either because a judgment resolving such a petition has become final and conclusive or because a petition was not timely filed. (*California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183, 1201; see *Long Beach Unified School Dist. v. State of California* (1990) 225 Cal.App.3d 155, 169.) The Commission's decision obviously is still under judicial review and subject to direct attack. Thus, despite the length of time since the Commission's decision was made, due to the decision's prolonged and ongoing judicial review, it is not final for purposes of determining whether a retroactive or clarifying statute applies to it.

"A basic canon of statutory interpretation is that statutes do not operate retrospectively unless the Legislature plainly intended them to do so. (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207-1208; *Aetna Cas[ualty] & Surety Co. v. Ind[ustrial] Acc. Com.* (1947) 30 Cal.2d 388, 393.) . . . Of course, when the Legislature clearly intends a statute to operate retrospectively, we are obliged to carry out that intent unless due process considerations prevent us. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587, 592.)

"A corollary to these rules is that a statute that merely *clarifies,* rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment. We assume the Legislature amends a statute for a purpose, but that purpose need not necessarily be to change the law. (Cf. *Williams v. Garcetti* (1993) 5 Cal.4th 561, 568.) Our consideration of the surrounding circumstances can indicate that the Legislature made material changes in statutory language in an effort only to clarify a statute's true meaning. [Citations.] Such a legislative act has no retrospective effect because the true meaning of the statute remains the same." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 (*Western Security Bank*).)

We turn first to the State's argument that Sen. Bill 231 merely clarified existing law.  "A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment.  (*Western Security Bank,* [*supra,*] 15 Cal.4th 232, 243.)  However, a statute might not apply retroactively when it substantially changes the legal consequences of past actions, or upsets expectations based in prior law.  ([*Id.* at p. 243]; see also *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 269 [] (*Landgraf*).)

" '[T]he interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts.' (*Western Security Bank, supra,* 15 Cal.4th at p. 244.)  When [the California Supreme Court] 'finally and definitively' interprets a statute, the Legislature does not have the power to then state that a later amendment merely declared existing law.  (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473 (*McClung*).)

"However, 'if the courts have not yet finally and conclusively interpreted a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration.  [Citation.]  But even then, "a legislative declaration of an existing statute's meaning" is but a factor for a court to consider and "is neither binding nor conclusive in construing the statute." [Citation.]' (*McClung, supra,* 34 Cal.4th at p. 473 and cases cited.)  . . . .

"A legislative declaration that an amendment merely clarified existing law 'cannot be given an obviously absurd effect, and the court cannot accept the Legislative statement that an unmistakable change in the statute is nothing more than a clarification and restatement of its original terms.' (*California Emp.[loyment Stabilization] etc. Com. v. Payne* (1947) 31 Cal.2d 210, 214.)  Material changes in language, however, may simply indicate an effort to clarify the statute's true meaning.  (*Western Security Bank, supra,* 15 Cal.4th at p. 243.)  'One such circumstance is when the Legislature promptly reacts to the emergence of a novel question of statutory interpretation[.]' (*Ibid.*) ' " 'An amendment which in effect construes and clarifies a prior statute must be accepted as the

34

legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute. . . . [¶] If the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act—a formal change—rebutting the presumption of substantial change.' [Citation.]" ' (*Ibid.*)" (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922-923.)

"We look to 'the surrounding circumstances' as well as the Legislature's intent when determining whether a statute changed or merely clarified the law." (*In re Marriage of Fellows* (2006) 39 Cal.4th 179, 184.)

Sen. Bill 231 did not merely clarify the law; it changed the law. Since 2002, *City of Salinas* had defined the term "sewer" in Proposition 218 as referring only to sanitary sewers. Nothing in the record indicates any other court had interpreted the term as used in Proposition 218 or was interpreting the term when the Legislature adopted Sen. Bill 231. Sen. Bill 231 overruled *City of Salinas* and changed the law to define "sewer" to include stormwater drainage systems. "[A]lthough the Legislature may amend a statute to overrule a judicial decision, doing so *changes* the law . . . ." (*McClung, supra*, 34 Cal.4th at pp. 473-474.)

In addition, this was not a case where the Legislature adopted an amendment soon after a controversy arose concerning the proper interpretation of Proposition 218. Indeed, there is nothing in the record indicating any controversy arose immediately prior to Sen. Bill 231's adoption. The statute mentions only *City of Salinas* as its reason, and that decision was issued 15 years before Sen. Bill 231 was enacted. The Commission issued its decision in this case seven years before the Legislature adopted Sen. Bill 231. We are not required to accept as a legislative declaration or clarification of the original statute's meaning an amendment which was adopted so long after any controversy arose from *City*

35

*of Salinas's* interpretation of Proposition 218.  (See *Carter v. California Dept. of Veterans Affairs, supra*, 38 Cal.4th at p. 923.)

Having concluded Sen. Bill 231 did not merely clarify the law, we turn to determine whether the Legislature intended the statute to operate retroactively.  "[A] new law operates 'retroactively' when it changes ' " 'the legal consequences of past conduct by imposing new or different liabilities based upon such conduct.' " '  [Citation.]  We have asked whether the new law ' " '*substantially* affect[s] existing rights and obligations.' " '  [Citation.]"  (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 229.)

"[U]nless there is an 'express retroactivity provision, a statute will *not* be applied retroactively unless it is *very clear* from extrinsic sources that the Legislature . . . must have intended a retroactive application' (*Evangelatos* [*v. Superior Court*]*, supra,* 44 Cal.3d at p. 1209 []). . . .  [A] statute's retroactivity is, in the first instance, a policy determination for the Legislature and one to which courts defer absent 'some constitutional objection' to retroactivity.  (*Western Security Bank,* [*supra,*] 15 Cal.4th [at p.] 244.)  But 'a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective.' (*I.N.S. v. St. Cyr* [(2001)] 533 U.S. [289,] 320-321, fn. 45 []); *Lindh v. Murphy* (1997) 52  U.S. 320, 328, fn. 4 [] [' "retroactive" effect adequately authorized by a statute' only when statutory language was 'so clear that it could sustain only one interpretation'].)"  (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841.)

The State claims the Legislature's statements in section 53751 constitute a legally sufficient expression that the Legislature intended Sen. Bill 231 to apply retroactively.  The State also contends that Sen. Bill 856's provision, that an agency's authority to levy fees prevents subvention under Section 6 regardless of whether the authority was adopted prior to or after the date the Commission issued its decision, further supports the Legislature's intent to apply Sen. Bill 231 retroactively.

36

It is not clear that the Legislature intended Sen. Bill 231 to apply retroactively. Sen. Bill 231 contains no express statement that the Legislature intended the bill to apply retroactively. There is no statement that the bill merely declared existing law. Sen. Bill 231 overruled *City of Salinas*, but the length of time between that case and Sen. Bill 231's enactment suggests the Legislature did not necessarily intend for Sen. Bill 231 to be retroactive. The measure's strongest statement of retroactive intent is the statement in section 53751 that the Legislature "reaffirms and reiterates that the definition found in Section 230.5 of the Public Utilities Code is the definition of 'sewer' or 'sewer service' that should be used in the Proposition 218 Omnibus Implementation Act." (Gov. Code, § 53751, subd. (l).) "Reaffirms and reiterates" is incorrect language when the Legislature had never before declared, affirmed, or iterated the meaning of "sewer" in the Implementation Act.

As discussed above, Proposition 218, enacted in 1996, distinguished between sewers and drainage systems. The Legislature adopted the Implementation Act in 1997, but it did not then nor in a 1998 amendment define the term "sewer." *City of Salinas* defined the term in 2002. The Legislature amended the Implementation Act three months later, but it did not define "sewer" or otherwise respond to *City of Salinas*. Fifteen years later, the Legislature overruled *City of Salinas* in Sen. Bill 231 and defined "sewer" in the Implementation Act for the first time. Where the statement that the Legislature reaffirmed and reiterated a prior position is erroneous, especially when the new legislation changed the law, the statement is insufficient to establish a very clear expression of retroactive intent. (See *McClung, supra*, 34 Cal.4th at pp. 475-476 [erroneous statement that an amendment merely declared existing law where it actually changed the law was insufficient to overcome the strong presumption against retroactivity].)

Sen. Bill 856 also does not indicate Sen. Bill 231 should apply retroactively. That bill amended section 17556(d), the statute that prevents subvention if the local agency has

fee authority, to provide that the limitation applied regardless of whether the authority to levy fees was enacted or adopted prior to or after the date on which the mandate was issued. However, Sen. Bill 856 also provided a process whereby a party may request the Commission to reconsider a prior decision based on a subsequent change of law. (Gov. Code, §§ 17514, 17570, subds. (b)-(d), (f), 17556, subd. (d).) If the Commission determines that a change of law reduces the State's subvention obligation, the Commission can revise the subvention requirements but starting no earlier than the fiscal year preceding the fiscal year in which the request for reconsideration was filed. (Gov. Code, § 17556, subd. (b).) Here, there is no evidence the State pursuant to Sen. Bill 856 has sought reconsideration of the Commission's decision based on Sen. Bill 231. And even if it had, Sen. Bill 856 would not render Sen. Bill 231 retroactive to the point in time in 2007 when the Commission issued its decision in this matter.

It is obvious that the Legislature intended Sen. Bill 231 to overrule *City of Salinas*. It is not obvious, however, that the Legislature intended Sen. Bill 231 to apply retroactively. We therefore conclude Sen. Bill 231 does not apply to this case.

### 3. *Application of Paradise Irrigation Dist.*

The State contends that even if Sen. Bill 231 is not retroactive, we still may conclude permittees have authority to levy fees for the six permit conditions. In *Paradise Irrigation Dist., supra*, 33 Cal.App.5th 174, a panel of this court ruled that "the *possibility* of a protest" under article XIII D did not eviscerate the local agencies' ability to levy fees to comply with the state mandate. (*Paradise Irrigation Dist.* at p. 194.) The State argues that our reasoning in *Paradise Irrigation District* applies equally here, that the required voter approval under article XIII D, like the protest procedure, does not extinguish a local agency's ability to raise fees.

In *Paradise Irrigation Dist.*, a group of irrigation and water districts contended they were entitled to subvention under Section 6 because they did not have sufficient

38

legal authority to levy fees to pay for water service improvements mandated by the Water Conservation Act of 2009 (Stats. 2009-2010, 7th Ex. Sess. 2009-2010, ch. 4, § 1.) The districts claimed they did not have fee authority because under article XIII D, although the fees would not require voter approval, they could be defeated by a majority of water customers filing written protests. (*Paradise Irrigation Dist., supra*, 33 Cal.App.5th at p. 182.)

We disagreed with the districts. We based our opinion on the analysis in *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205 (*Bighorn*). That case concerned the validity of a proposed initiative that sought to reduce a local water district's charges and require any future charges to be preapproved by the voters. The California Supreme Court held the initiative could do the former but not the latter. State statutes had delegated exclusive authority to the districts to set their fees, and such legislative actions made under exclusive authority generally are not subject to initiatives. (*Id.* at pp. 210, 219; see *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775-777.) However, article XIII C, section 3 of the state constitution states the initiative power may not be prohibited or otherwise limited in matters of reducing or repealing any local tax, assessment, fee, or charge. The district's water charges were fees subject to article XIII C, and thus an initiative could seek to reduce the districts' rates. (*Bighorn,* at pp. 212-217.) But nothing in article XIII C authorized initiative measures to impose voter-approval requirements for new or increased fees and charges. And article XIII D expressed the voters' intent that water service fees do not need to be approved by voters. Thus, the exclusive delegation rule barred the proposed initiative's attempt to subject the district's exercise of its fee-setting authority to voter approval. (*Bighorn,* at pp. 215-216, 218-219.)

In a long passage, the Supreme Court commented, "[B]y exercising the initiative power voters may decrease a public water agency's fees and charges for water service, but the agency's governing board may then raise other fees or impose new fees without

prior voter approval. Although this power-sharing arrangement has the potential for conflict, we must presume that both sides will act reasonably and in good faith, and that the political process will eventually lead to compromises that are mutually acceptable and both financially and legally sound. (See *DeVita v. County of Napa, supra*, 9 Cal.4th at pp. 792-793 ['We should not presume . . . that the electorate will fail to do the legally proper thing.'].) We presume local voters will give appropriate consideration and deference to a governing board's judgments about the rate structure needed to ensure a public water agency's fiscal solvency, and we assume the board, whose members are elected . . . will give appropriate consideration and deference to the voters' expressed wishes for affordable water service. The notice and hearing requirements of subdivision (a) of section 6 of California Constitution article XIII D [the owner protest procedures] will facilitate communications between a public water agency's board and its customers, and the substantive restrictions on property-related charges in subdivision (b) of the same section should allay customers' concerns that the agency's water delivery charges are excessive." (*Bighorn, supra*, 39 Cal.4th at pp. 220-221, fns. omitted.)

Deciding *Paradise Irrigation Dist.*, we found in *Bighorn* "an approach to understanding how voter powers to affect water district rates affect the ability of the water districts to recover their costs." (*Paradise Irrigation Dist., supra*, 33 Cal.App.5th at p. 191.) Like the water district in *Bighorn*, the districts in *Paradise Irrigation Dist.* had statutory authority to set their fees for water service improvements, and those fees were not subject to prior voter approval. We held the districts thus had sufficient authority to set fees to recover the costs of complying with the state mandate. (*Id*. at pp. 192-193.) Article XIII D's protest procedure and similar statutory protest procedures, like the limited initiative power affirmed in *Bighorn*, did not divest the districts of their fee authority. Rather, the protest procedures created a power-sharing arrangement similar to that in *Bighorn* where presumably voters would appropriately consider the state mandated requirements imposed on the districts. (*Paradise Irrigation Dist*., at pp. 194-

195.) "[T]he *possibility* of a protest under article XIII D, section 6, does not eviscerate [the districts'] ability to raise fees to comply with the [Water] Conservation Act." (*Id.* at p. 194.)

The State contends the reasoning in *Paradise Irrigation Dist.* applies equally here where article XIII D requires the voters to preapprove fees. It argues that as with the voter protest procedure, under article XIII D permittees' governing bodies and the voters who elected those officials share power to impose fees. The governing bodies propose the fee, and the voters must approve it. The "fact that San Diego property owners could theoretically withhold approval—just as a majority of the governing body could theoretically withhold approval to impose a fee—does not 'eviscerate' San Diego's police power; that power exists regardless of what the property owners, or the governing body, might decide about any given fee."

The State's argument does not recognize a key distinction we made in *Paradise Irrigation Dist.*: water service fees were not subject to voter approval. We contrasted article XIII D's protest procedure with the voter-approval requirement imposed by Proposition 218 on new taxes. Under article XIII C, no local government may impose or increase any general or special tax "unless and until that tax is submitted to the electorate and approved" by a majority of the voters for a general tax and by a two-thirds vote for a special tax. (Cal. Const., art. XIII C, § 2, subds. (b), (d).) Under article XIII D, however, water service fees do not require the consent of the voters. (Cal. Const., art. XIII D, § 6, subd. (c).) (*Paradise Irrigation Dist., supra*, 33 Cal.App.5th at p. 192.) The implication is the voter approval requirement would deprive the districts of fee authority.

Since the fees in *Paradise Irrigation Dist.* were not subject to voter approval, the protest procedure created a power sharing arrangement like that in *Bighorn* which did not deprive the districts of their fee authority. In *Bighorn*, the power-sharing arrangement existed because voters could possibly bring an initiative or referendum to reduce charges, but the validity of the fee was not contingent on the voters preapproving it. In *Paradise*

41

*Irrigation Dist.*, the power-sharing arrangement existed because voters could possibly protest the water fee, but the validity of the fee was not contingent on voters preapproving the fee. The water fee was valid unless the voters successfully protested, an event the trial court in *Paradise Irrigation Dist.* correctly described as a "speculative and uncertain threat." (*Paradise Irrigation Dist., supra*, 33 Cal.App.5th at p. 184.)

Here, a fee for stormwater drainage services is *not* valid unless and until the voters approve it. For property-related fees, article XIII D limits permittees' police power to proposing the fee. Like article XIII C's limitation on local governments' taxing authority, article XIII D provides that "[e]xcept for fees or charges for sewer, water, and refuse collection services, no property related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area." (Cal. Const., art. XIII D, § 6, subd. (c).) The State's argument ignores the actual limitation article XIII D imposes on permittees' police power. Permittees expressly have no authority to levy a property-related fee unless and until the voters approve it. There is no power sharing arrangement.

This limitation is crucial to our analysis. The voter approval requirement is a primary reason Section 6 exists and requires subvention. As stated earlier, the purpose of Section 6 "is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose." (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 81.) And what are those limitations? Voter approval requirements, to name some.

Articles XIII A and XIII B "work in tandem, together restricting California governments' power both to levy and to spend for public purposes." (*City of*

*Sacramento, supra*, 50 Cal.3d at p. 59, fn. 1.) Article XIII A prevents local governments from levying special taxes without approval by two-thirds of the voters. (Cal. Const., art. XIII A, § 4.) It also prevents local governments from levying an ad valorem tax on real and personal property. (Cal. Const., art. XIII A, § 1.) Article XIII B, adopted as the "next logical step" to article XIII A, limits the growth of appropriations made from the proceeds of taxes. (Cal. Const., art. XIII B, §§ 1, 2, 8; *City Council v. South* (1983) 146 Cal.App.3d 320, 333-334.) And, as stated above, article XIII C extends the voter approval requirement to local government general taxes. (Cal. Const., art. XIII C, § 2, subd. (b).)

Subvention is required under Section 6 because these limits on local governments' taxing and spending authority, especially the voter approval requirements, deprive local governments of the authority to enact taxes to pay for new state mandates. They do not create a power-sharing arrangement with voters. They limit local government's authority to proposing a tax only, a level of authority that does not guarantee resources to pay for a new mandate. Section 6 provides them with those resources.

Article XIII D's voter approval requirement for property-related fees operates to the same effect. Unlike the owner protest procedure at issue in *Paradise Irrigation Dist.*, the voter approval requirement does not create a power sharing arrangement. It limits a local government's authority to proposing a fee only; again, a level of authority that does not guarantee resources to pay for a state mandate. Section 6 thus requires subvention because of Article XIII D's voter approval requirement. Contrary to the State's argument, *Paradise Irrigation Dist.* does not compel a different result.

### 4.    Street sweeping condition

The Commission originally determined that permittees lacked sufficient authority to levy a fee for the street sweeping condition, and thus it was a reimbursable mandate. The Commission found that although permittees had authority to levy a fee for street

sweeping pursuant to Public Resources Code section 40059, and that such a fee would be exempt from article XIII D's voter approval requirement as a refuse collection fee, the fee would not be exempt from article XIII D's owner protest procedure. (Cal. Const., art. XIII D, § 6.) The Commission concluded that the owner protest procedure denied permittees sufficient authority to levy a fee for the street sweeping condition, and the condition was a reimbursable mandate.

After the Commission issued its decision, this court issued *Paradise Irrigation Dist.* and, as already explained, determined that article XIII D's owner protest procedure did not deprive local governments of authority to levy water service fees. (*Paradise Irrigation Dist., supra*, 33 Cal.App.5th at pp. 192-195.) In its respondent's brief, the Commission now agrees with the State that, as a result of *Paradise Irrigation Dist.*, permittees have authority to levy fees for the street sweeping condition, and that the condition is not a reimbursable mandate. The fee is not subject to voter approval, and voter protest requirements applicable to refuse service fees do not deprive permittees of their authority to levy fees for that service.

Permittees disagree with the Commission's new position. They claim *Paradise Irrigation Dist.* does not affect the issue. Public Resources Code section 40059 authorizes a fee for solid waste handling, but the street sweeping condition was imposed to prevent and abate pollution in waterways and on beaches, not to collect solid waste. The State and the Commission also have not established that street sweeping qualifies as solid waste handling under Public Resources Code section 40059, or that a fee for such activity qualifies as "refuse collection" for purposes of article XIII D. In addition, the State has not established how a fee for street sweeping can satisfy article XIII D's substantive requirements which apply to all property-related fees.

Before reaching its original holding, the Commission concluded the street sweeping fees qualified as refuse collection fees for purposes of article XIII D's voter approval exemption. The Commission determined that permittees had authority to adopt

street cleaning fees pursuant to their authority to adopt fees for solid waste handling. Public Resources Code section 40059 grants local agencies the authority to determine fees and charges for "solid waste handling." (Pub. Resources Code, § 40059, subd. (a)(1).) " 'Solid waste handling' " means "the collection, transportation, storage, transfer, or processing of solid wastes." (Pub. Resources Code, § 40195.) " 'Solid waste' " includes "all putrescible and nonputrescible solid, semisolid, and liquid wastes" including garbage, trash, refuse, paper, rubbish, ashes, and the like. (Pub. Resources Code, § 40191.) The Commission determined that " '[g]iven the nature of material swept from city streets, street sweeping falls under the rubric of "solid waste handling," ' " and permittees thus had authority to adopt fees for street sweeping.

Article XIII D exempts "refuse collection" fees from its voter approval requirement, but neither it nor the Implementation Act define "refuse collection." The Commission determined the plain meaning of refuse collection is the same as solid waste handling. "Refuse is collected via solid waste handling." As a result, the Commission concluded that street cleaning fees would qualify as refuse collection fees and were therefore expressly exempt from article XIII D's voter approval requirement.

Permittees assert that "no one" has demonstrated that a fee for street sweeping qualifies as refuse collection for purposes of article XIII D. Yet permittees offer no alternative to the Commission's interpretation that street sweeping is waste handling, and that waste handling is refuse collecting. We independently review the Commission's interpretation of the permit and statutory provisions. (*Los Angeles Mandates I, supra*, 1 Cal.5th at p. 762.) Giving the language a plain and commonsense meaning as we are required to do (*City of San Jose, supra,* 2 Cal.5th at p. 616), we agree with the Commission's interpretation that street sweeping, as required by the permit, is refuse collecting for purposes of article XIII D.

The permit requires each permittee to implement a program "to sweep improved (possessing a curb and gutter) municipal roads, streets, highways, and parking facilities."

45

Frequency depends on the volume of trash each street generates. Roads "consistently generating the highest volumes of trash and/or debris shall be swept at least two times per month." Roads that generate "moderate" or "low" "volumes of trash and/or debris" are to be swept less frequently.

As part of their reporting responsibilities, permittees must annually identify the total distance of curb miles of roads identified "as consistently generating the highest volumes of trash and/or debris," and also the curb miles of roads identified as "consistently generating moderate volumes of trash and/or debris" and "low volumes of trash and/or debris[.]" Additionally, permittees must annually report the "[a]mount of material (tons) collected from street and parking lot sweeping."

It is obvious that the street sweeping condition expressly requires permittees to collect refuse. Refuse means "rubbish, trash, garbage." (Merriam-Webster- Unabridged Dict. Online (2022) < https://unabridged.merriam-webster.com/unabridged/refuse, par.3> [as of Aug. 25, 2022], archive at:<https://perma.cc/YDN3-8T7W>.) Permittees must collect and record the volumes of trash removed by street sweeping. Thus, a fee for collecting that refuse and charged pursuant to Public Resources Code section 40059 would as a fee for refuse collection services be exempt from article XIII D's voter approval requirement.

Permittees claim the street sweeping requirement was not imposed to collect solid waste as contemplated by Public Resources Code section 40059 but was intended to prevent or abate pollution. We rejected this type of argument earlier when the State made it. Recall that for purposes of Section 6, the State's purpose for imposing a mandate does not determine whether the mandate is a new program. Similarly, if street sweeping qualifies as waste handling for purposes of Public Resources Code section 40059, then permittees have authority to levy a fee for it, regardless of why the state imposed the street sweeping condition.

46

Relying on *Los Angeles Mandates II, supra*, 59 Cal.App.5th at page 568, permittees claim the State has the burden of proving their fee authority, and specifically that a fee for street sweeping would satisfy article XIII D's substantive requirements for property-related fees. Permittees assert the State has not met its burden. *Los Angeles Mandates II* is distinguishable. There, the court of appeal determined that an NPDES permit condition requiring the local governments to install and maintain trash receptacles at public transit stops owned by other public entities required subvention under Section 6 because the local agencies did not have sufficient authority to levy fees for the requirement. (*Los Angeles Mandates II,* at p. 561.) The local governments did not have authority to install equipment on another public entity's property and then charge that entity for installation and ongoing maintenance. (*Id*. at pp. 565-567.)

The state in that case contended the local agencies could impose a fee on private property owners, and that such a fee would survive limitations imposed by article XIII D. Assuming for purposes of argument that the fee would overcome all of article XIII D's procedural hurdles, such as the owner protest and voter approval requirements, the court of appeal determined the state had not shown the fee would meet article XIII D's substantive requirements for property-related fees. (*Los Angeles Mandates II, supra*, 59 Cal.App.5th at pp. 567-568.) The state did not cite to the record or to authority showing such a fee could satisfy the substantive requirements, and common sense dictated it could not. (*Id*. at p. 568.)

Three of the substantive requirements permit a property-related fee only if the amount of the fee does not exceed the proportional cost of that attributable to the parcel, the fee is imposed for a service that is actually used by, or immediately available to, the owner of the property in question, and the fee is not imposed for general governmental services where the service was available to the public at large in substantially the same manner as it was to property owners. (Cal. Const., art. XIII D, § 6, subd. (b)(3)-(5).) The state could not satisfy the requirements because the vast majority of persons who would

47

use trash receptacles at transit stops would be pedestrians, transit riders, and other members of the public, not the owners of adjacent properties. Any benefit to them would be incidental. Moreover, the placement of the receptacles at public transit stops would make the service available to the public at large in the same manner as it would to property owners. (*Los Angeles Mandates II, supra*, 59 Cal.App.5th at pp. 568-569.)

The state claimed two other statutes, including Public Resources Code section 40059, gave the local agencies sufficient fee authority. The court of appeal did not dispute that the statutes authorized the agencies to impose fees, including waste management fees under Public Resources Code section 40059, but the statutes did not exempt such fees from the constitutional requirements imposed by article XIII D. (*Los Angeles Mandates II, supra*, 59 Cal.App.5th at pp. 569-570.)

There is no dispute that any fee permittees may charge for the street sweeping condition will be subject to article XIII D's substantive requirements. Permittees, however, citing *Los Angeles Mandate II*, claim the State, as the party seeking to establish an exception to subvention under Section 6, has the burden at this stage to establish that any fee permittees may adopt will meet all of the substantive requirements, and the state has not met that burden. "Typically, the party claiming the applicability of an exception bears the burden of demonstrating that it applies." (*Los Angeles Mandates I, supra,* 1 Cal.5th at p. 769.)

The State argues that this typical approach should not apply to the burden of showing fee authority under section 17556(d). It claims the inherent flexibility in permittees' police power means permittees may develop fees in any number of ways. Also, local governments like permittees have significantly more expertise and experience than the State agencies before us in designing, implementing, and defending local government fees. The State asserts that permittees' expertise means they should bear the burden on this point.

We agree the State has the burden of establishing that permittees have fee authority, but that burden does not require the State also to prove permittees as a matter of law and fact are able to promulgate a fee that satisfies article XIII D's substantive requirements. The sole issue before us is whether permittees have "the authority, i.e., the right or power, to levy fees sufficient to cover the costs of the state-mandated program." (*Connell v. Superior Court* (1997) 59 Cal.App.4th 382, 401.) The inquiry is an issue of law, not a question of fact. (*Ibid.*)

"The lay meaning of 'authority' includes 'the power or right to give commands [or] take action . . . .' (Webster's New World Dictionary (3d college ed.1988) p. 92.) Thus, when we commonly ask whether a police officer has the 'authority' to arrest a suspect, we want to know whether the officer has the legal sanction to effect the arrest, not whether the arrest can be effected as a practical matter. [¶] Thus, the plain language of the statute precludes reimbursement where the local agency has the authority, i.e., the right or the power, to levy fees sufficient to cover the costs of the state-mandated program." (*Connell v. Superior Court, supra*, 59 Cal.App.4th at p. 401.)

The State has established that permittees have the right or power to levy a fee for the street cleaning condition pursuant to Public Resources Code section 40059. Implicit in that determination is that permittees have the right or power to levy a fee that complies with article XIII D's substantive requirements. Unless it can be shown on undisputed facts in the record or as a matter of law that a fee cannot satisfy article XIII D's substantive requirements, as was found in *Los Angeles Mandates II*, the establishment by the State of the local agencies' power or authority to levy a fee without voter approval or without being subject to other limitations establishes that a local government has sufficient fee authority for purposes of section 17556(d).

Although the court of appeal in *Los Angeles Mandates II* stated the state bore the burden to show that a fee for public trash receptacles could satisfy the substantive requirements, and that the state did not satisfy its burden, the court actually ruled that the

49

local governments could not establish a fee that could meet the substantive requirements as a matter of law or undisputed fact. (*Los Angeles Mandates II, supra*, 59 Cal.App.5th at pp. 568-569 ["common sense dictates" that fee would not meet requirements].) To require the State to show affirmatively how permittees can create a fee that meets the substantive requirements where no fee yet exists requires the State effectively to engage in the rulemaking process itself. That asks the State to do more than establish permittees have the lawful authority to enact a fee, which is the sole issue. To the extent *Los Angeles Mandates II* requires the State to prove more, we respectfully disagree with its interpretation.

Here, the State has established that permittees have sufficient fee authority to levy a fee for the street sweeping condition. As a result, the condition does not trigger subvention under Section 6. We will reverse the trial court's contrary holding on this issue.

IV

*Permittees' Cross-Appeal*

A.      Background

Permittees' cross appeal challenges the Commission's decision that permittees have sufficient authority to levy fees to recover the costs for two of the challenged conditions: the development and implementation of a hydromodification management plan (HMP) and low impact development (LID) requirements, both for use on "priority development projects."

Under the permit, priority development projects in general are certain new developments that increase pollutants in stormwater and in discharges from MS4s. These include certain residential, commercial, and industrial uses along with parking lots and roads that add impervious surfaces or are built on hillsides or in environmentally sensitive areas.

50

The permit requires permittees to develop and implement an HMP to mitigate increases in runoff discharge rates and durations from priority development projects. Hydromodification refers to the change in natural hydrologic processes and runoff characteristics caused by urbanization or other land use changes that result in increased stream flows and sediment transport. The plan would apply where increased runoff rates and durations from priority development projects would likely cause increased erosion of channel beds and banks, sediment pollutant generation, or other impacts to beneficial uses and stream habitat.

LID requirements are stormwater management and land development strategies to minimize directly-connected impervious areas and promote ground infiltration at priority development projects. They emphasize conservation and the use of on-site natural features, integrated with engineered, small-scale hydrologic controls to reflect pre-development hydrologic functions more closely. The permit requires permittees to add LID requirements to their local Standard Urban Storm Water Mitigation Plans.

The Commission determined that permittees had authority to levy fees to recover the costs of developing and implementing the HMP and the LID requirements because fees for those actions would not require voter approval under article XIII D. The purpose of the two conditions "is to prevent or abate pollution in waterways and beaches in San Diego County." Permittees have authority to impose the fees for this purpose under their police power, and article XIII D does not apply to fees imposed under the police power as a condition of property development or as a result of a property owner's voluntary decision to seek a government benefit. Additionally, the Mitigation Fee Act (Gov. Code, § 66000, et seq.) grants permittees statutory authority to impose development fees to recover the costs for complying with the HMP and LID conditions which, again, are exempt from article XIII D. Because permittees had the authority to levy fees to recover the costs of the HMP and LID conditions without having to obtain voter approval, the Commission concluded the conditions were not reimbursable mandates under Section 6.

51

The trial court upheld the Commission's determinations on the same grounds.

B.      Analysis

Permittees contend the Commission and the trial court erred.  They do not dispute that they may enact regulatory fees pursuant to their police power.  They focus their argument on recovering only the costs of creating the HMP and the LID requirements, and they claim that fees to recover those costs cannot meet the "substantive requirements" to be exempt from the voter approval requirements found in section 6 of article XIII D or article XIII C, section 1, subdivision (e)(2) of the state constitution. They also contend that fees to recover those costs cannot satisfy the substantive requirements of the Mitigation Fee Act.

Before addressing permittees' authority to levy a fee for the HMP and LID conditions, we refute an assumption underlying their argument.  Section 6 of article XIII D and its voter approval requirements do not apply in this instance.  The Commission found that permittees had authority to recover the costs of preparing the HMP and the LID requirements by imposing a fee as a condition for approving new priority development projects.  Article XIII D does not apply to fees imposed on real property development.  (Cal. Const., art. XIII D, § 1.)  Article XIII D also does not apply to fees imposed on property owners for their voluntary decision to apply for a government benefit.  (*Richmond v. Shasta Community Services Dist., supra*, 32 Cal.4th at pp. 425-428.)  The proposed fee at issue here would be imposed as a condition for approving new real property development and based on the developer's application for government approval to proceed with the development.  Article XIII D does not apply in this circumstance.

Also, at the time the Commission issued its decision, the state constitution did not expressly define taxes and fees or their differences.  In November 2010, shortly after the Commission issued its decision, voters approved Proposition 26, which amended section

1 of article XIII C by adding subdivision (e), the provision cited by permittees. (Prop. 26, Cal. Const., art.§ 3, approved by voters, Gen. Elec. (Nov. 2, 2010), eff. (Nov. 3, 2010).) Proposition 26 defined a local tax subject to voter approval as "any levy, charge, or exaction of any kind imposed by a local government" except for certain enumerated charges and fees. (Cal. Const., art. XIII C, §§ 1, subd. (e), 2.) Proposition 26 is not retroactive, and thus its definitions of a tax and fee do not apply to the Commission's decision. (*Brooktrails Township Community Services Dist. v. Board of Supervisors* (2013) 218 Cal.App.4th 195, 205-207.) However, Proposition 26 codified much, but not all, of the relevant case authority that existed at the time of the measure's enactment regarding the requirements for a valid fee. (*City of San Buenaventura v. United Water Conservation Dist*. (2017) 3 Cal.5th 1191, 1210.) In determining whether permittees can levy a fee or whether a fee they enact would be valid, we will restrict ourselves to authority and rules established before Proposition 26 was adopted or which the measure codified.

In general, all taxes imposed by local governments must be approved by the voters, but development fees and regulatory fees that meet certain requirements are not required to be approved by the voters. (Cal. Const., arts. XIII C, § 2; XIII D, § 1, subd. (b); *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 875-876.) A levy qualifies as a regulatory fee if "(1) the amount of the fee does not exceed the reasonable costs of providing the services for which it is charged, (2) the fee is not levied for unrelated revenue purposes, and (3) the amount of the fee bears a reasonable relationship to the burdens created by the feepayers' activities or operations. ([*Sinclair Paint Co. v. State Bd. of Equalization, supra*, 15 Cal.4th at p. 881].) If those conditions are not met, the levy is a tax." (*California Building Industry Assn v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1046.)

These are the substantive requirements that permittees claim a fee for the HMP and LID conditions cannot satisfy. Specifically, they claim that a fee to recover the cost

of creating the HMP and the LID requirements cannot meet the first and third required elements of a valid regulatory fee. They assert that any fee revenue they collected from developers of priority development projects would exceed the cost of creating the HMP and the LID requirements. They incurred $1.1 million in drafting the plans, and the plans were drafted before any development projects could be charged a fee. They argue that if they collected fees from all applicable developers, eventually the fees collected would exceed the $1.1 million cost to write the plans. If they stopped charging fees after collecting $1.1 million, developers who paid the fee would have paid more than they should for their benefit or burden.

Permittees also claim that the amount of a fee for recovering the costs of creating the HMP and the LID requirements would not have a fair or reasonable relationship to the burdens created by future developers' activities or operations. Permittees assert they lack any means of reasonably allocating the costs of creating the HMP and the LID requirements among particular development projects and their proponents. Case authority requires the fee to be based on a project's contribution to the impact being addressed, but permittees assert they cannot monitor pollutants from all future development projects to establish an emissions-based formula for allocating the fee. (See *San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1146 (*San Diego Gas*).) Permittees argue that case authority also prevents them from allocating a fee based on the physical characteristics of individual properties. (See *City of Salinas, supra*, 98 Cal.App.4th at p. 1355.)

Whether a levy constitutes a fee or tax is a question of law determined upon an independent review of the record. (*California Building Industry Assn v. State Water Resources Control Bd., supra*, 4 Cal.5th at p. 1046.) Here, of course, there is no adopted fee to which we could apply the substantive requirements. And permittees direct us to no evidence in the record supporting their claim that, in effect, it is factually and legally

impossible for them to adopt a valid regulatory fee to recover the cost of creating the HMP and the LID requirements.

As with the street sweeping condition, the sole issue before us is whether permittees have the authority, i.e., "the right or power, to levy fees sufficient to cover the costs." (*Connell v. Superior Court, supra*, 59 Cal.App.4th at p. 401.) There is no dispute that permittees' police power vests them with the legal authority to levy fees that will satisfy the substantive requirements to avoid being considered as taxes. That fact ends our analysis unless permittees can establish they cannot levy a regulatory or development fee as a matter of law.

There is no evidence in the record that permittees cannot levy a fee in an amount that will not exceed their costs for creating the HMP and the LID requirements. "The scope of a regulatory fee is somewhat flexible and is related to the overall purposes of the regulatory governmental action. ' "A regulatory fee may be imposed under the police power when the fee constitutes an amount necessary to carry out the purposes and provisions of the regulation." [Citation.] "Such costs . . . include all those incident to the issuance of the license or permit, investigation, inspection, administration, maintenance of a system of supervision and enforcement." [Citation.] Regulatory fees are valid despite the absence of any perceived "benefit" accruing to the fee payers. [Citation.] Legislators "need only apply sound judgment and consider 'probabilities according to the best honest viewpoint of informed officials' in determining the amount of the regulatory fee." [Citation.]' ([*California Assn. of Prof. Scientists v. Department of Fish & Game* (2000)] 79 Cal.App.4th [935,] 945 [(*Prof. Scientists*)].) 'Simply because a fee exceeds the reasonable cost of providing the service or regulatory activity for which it is charged does not transform it into a tax.' (*Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 700.)" (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 438.)

Creating the HMP and the LID requirements constitute costs incident to the development permit which permittees will issue to priority development projects and the administration of permittees' pollution abatement program. Setting the fee will not require mathematical precision. Permittees' legislative bodies need only "consider 'probabilities according to the best honest viewpoint of [their] informed officials' " to set the amount of the fee. (*California Farm Bureau Federation v. State Water Resources Control Bd., supra*, 51 Cal.4th at p. 438.) "No one is suggesting [permittees] levy fees that exceed their costs." (*Connell v. Superior Court, supra*, 59 Cal.App.4th at p. 402.)

There is also no evidence in the record indicating permittees cannot levy a fee that will bear a reasonable relationship to the burdens created by future priority development. "A regulatory fee does not become a tax simply because the fee may be disproportionate to the service rendered to individual payors. (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 194.) The question of proportionality is not measured on an individual basis. Rather, it is measured collectively, considering all rate payors. (*Prof. Scientists, supra*, 79 Cal.App.4th at p. 948.) [¶] Thus, permissible fees must be related to the overall cost of the governmental regulation. They need not be finely calibrated to the precise benefit each individual fee payor might derive [or the precise burden each payer may create]. What a fee cannot do is exceed the reasonable cost of regulation with the generated surplus used for general revenue collection. An excessive fee that is used to generate general revenue becomes a tax." (*California Farm Bureau Federation v. State Water Resources Control Bd., supra*, 51 Cal.4th at p. 438.) Again, no one is suggesting permittees levy a fee to generate general revenue.

Permittees cite to *San Diego Gas, supra*, 203 Cal.App.3d at pages 1145-1149, and *City of Salinas, supra*, 98 Cal.App.4th at page 1355, to claim they lack any means of fairly or reasonably allocating the costs of creating the HMP and the LID requirements among priority development project proponents. Those cases, however, concern only the

56

facts before them and do not establish that permittees as a matter of law cannot enact a fee that meets the substantive requirements for regulatory fees.

In *San Diego Gas*, the court of appeal upheld an air pollution control district's imposition of a regulatory fee to cover the administrative cost of its permit program for industrial polluters. The fee was apportioned based on the amount of emissions discharged by a stationary pollution source. The record showed that the allocation of costs based on emissions fairly related to the permit holder's burden on the district's programs. (*San Diego Gas, supra*, 203 Cal.App.3d. at p. 1146.) The district's determination that a fee based on the labor costs incurred in the permit program would result in small polluters paying fees greater than their proportionate share of pollution reasonably justified using the emissions-based fee schedule to divide the costs more equitably. (*Id*. at pp. 1146-1147.)

Permittees contend that, similar to the labor-based fee in *San Diego Gas* that was not imposed, allocating the costs of preparing the HMP and the LID requirements pursuant to a formula unrelated to an individual project's contribution to pollution would not provide a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity. However, *San Diego Gas* does not stand for the proposition that an emissions-based, or discharge-based fee requiring direct monitoring is the only lawful fee for funding a pollution mitigation program. The case is limited to its facts, and the court in that case determined that the emissions-based fee before it met the substantive requirements for regulatory fees.

The substantive test is "a flexible assessment of proportionality within a broad range of reasonableness in setting fees." (*Prof. Scientists, supra*, 79 Cal.App.4th at p. 949.) This flexibility would be particularly appropriate where an obvious or accepted method such as an emissions-based fee is impractical. Indeed, "[r]egulatory fees, unlike other types of user fees, often are not easily correlated to a specific, ascertainable cost." (*Id*. at p. 950.) In those cases, even a flat-fee system may be a reasonable means of

allocating costs. (*Id*. at pp. 939, 950-955 [flat fee schedule to defray costs of performing environmental review was valid regulatory fee as long as the cumulative amount of the fee did not surpass the cost of the regulatory service and the record discloses a reasonable basis to justify distributing the cost among payors].) Permittees have not shown they cannot meet this flexible test.

Relying on *City of Salinas*, permittees also claim that charges based on the physical characteristics of a property, such as the amount of impervious surface area as a proxy for actual discharges, are not proportional to the amount of services requested or used and thus must be approved by the voters. (*City of Salinas, supra*, 98 Cal.App.4th at p. 1355.) Permittees misread the court's statement. The particular issue in *City of Salinas* was whether a fee charged by a city on all developed parcels to finance improvements to storm and surface water facilities was a property-related fee subject to article XIII D's voter approval requirements or a user fee comparable to the metered use of water or the operation of a business. The fee was calculated according to the degree to which the property contributed runoff to the city's drainage facilities, and a property's contribution was to be measured by the amount of "impervious area" on the parcel. (*City of Salinas,* at p. 1353.)

The city had argued the fee was a user fee because a property owner could theoretically opt out of paying it by maintaining its own stormwater management facility on the property. The court disagreed, finding the fee was appliable to each developed parcel in the city. (*City of Salinas, supra*, 98 Cal.App.4th at pp. 1354-1355.) One indicator the fee was not a user fee was the fact that any reduction in the fee based on lack of contribution of water was "not proportional to the amount of services requested or used by the occupant but on the physical properties of the parcel." (*Id*. at p. 1355.) The statement concerned the limited issue of whether the fee was a user fee. Contrary to permittees' interpretation, the court of appeal's statement does not mean that charges based on a property's physical characteristics, such as the amount of impervious surface

58

area as a proxy for actual discharges, are as a matter of law not proportional to the amount or level of services provided and must be approved by voters as a tax.

Permittees also raise an argument based on Proposition 26. They assert they cannot legally levy a fee to recover the cost of preparing the HMP and LID conditions because those planning actions benefit the public at large, citing *Newhall County Water Dist. v. Castaic Lake Water Agency* (2016) 243 Cal.App.4th 1430, 1451 (*Newhall*). Permittees misapply *Newhall*. *Newhall* concerned rates that a public water wholesaler of imported water charged to four public retail water purveyors. Part of the wholesaler's rates consisted of a fixed charge based on each retailer's rolling average of demand for the wholesaler's imported water and for groundwater which was not supplied by the wholesaler. Although the wholesaler was required to manage groundwater supplies in the basin, it did not sell groundwater to the retailers. (*Id.* at pp. 1434-1440.)

The court of appeal determined the rates did not qualify as fees under Proposition 26. Proposition 26 states a levy is not a tax where, among other uses, it is imposed "for a specific government service provided directly to the payor that is not provided to those not charged . . . ." (Cal. Const., art. XIII C, § 1, subd. (e)(2).) The only specific government service the wholesaler provided to the retailers was imported water. It did not provide groundwater, and the groundwater management activities it provided were not services provided just to the retailers. Instead, those activities "redound[ed] to the benefit of all groundwater extractors in the Basin[.]" (*Newhall, supra*, 243 Cal.App.4th at p. 1451.) The wholesaler could not base its fee and allocate its costs based on groundwater use because the wholesaler's groundwater management activities were provided to those who were not charged with the fee. (*Ibid*.; see also *Los Angeles Mandates II, supra*, 59 Cal.App.5th at p. 569 [article XIII D prohibits MS4 permittees from charging property owners for the cost of providing trash receptacles at public transit locations in part because service was made available to the public at large].)

59

Permittees argue that, as in *Newhall*, the costs of preparing the HMP and the LID requirements are part of their stormwater management programs. Although only proponents of priority development projects will be required to comply with the plans, the plans will "redound to the benefit of all" property owners, residents, and visitors in the region by improving water quality. Thus, a charge to recover the costs of creating the plan would not qualify as a fee and would be subject to voter approval, and as a result, permittees do not have authority to levy a fee for that purpose.

Assuming only for purposes of argument that Proposition 26 applies here, we disagree with permittees. Article XIII C, section 1, subdivision (e) defines a local tax subject to voter approval as "any levy, charge, or exaction of any kind imposed by a local government," with the express exception of seven different types of charges. Satisfying any one of those exceptions removes the charge from being a tax. The proposed fee permittees may impose satisfies two of those exceptions: a charge imposed for the reasonable regulatory cost to a local government for issuing permits, and a charge imposed as a condition of property development. (Cal. Const., art. XIII C, § 1, subd. (e)(3), (6).)

Under the exception at issue in *Newhall*, a charge is not a tax if it is "imposed for a specific government service or product provided directly to the payor that is not provided to those not charged . . . ." (Cal. Const., art. XIII C, § 1, subd. (e)(2).) The focus is on a service or product "provided directly" to the payor that is not provided to those not charged. Here, the service provided directly to developers of priority development projects is the preparation, implementation, and approval of water pollution mitigations applicable only to their projects. Unlike in *Newhall*, that service is not provided to anyone else, and only affected priority project developers will be charged for the service. The service will not be provided to those not charged. To interpret the provision as permittees do, that the exception from being a tax excludes fees for services that

ultimately but not directly redound to the public benefit,—which is not what *Newhall* held—is contrary to the statutory exception's express wording.

Separately, the County of San Diego raises another argument. It notes that under existing law, if a local agency has some fee authority, but not sufficient fee authority to cover the entire cost of a mandated activity, the mandate is reimbursable under Section 6 to the extent the cost cannot be recovered through fees. (See *Clovis Unified School Dist. v. Chiang* (2010) 188 Cal.App.4th 794, 812 (*Clovis Unified*).) The County contends the same principle should be true if a local agency only has fee authority contingent on the actions of third parties, in this case the prospective developers, whom the County and permittees do not control. Such a "contingent" mandate, so labeled by the County, is not "sufficient to pay for" the mandate, as required by section 17556(d), and should be deemed a reimbursable mandate.

The County misunderstands the principle. The County describes a situation where whether it collects revenue from the fee is contingent not on its legal authority to levy a fee, but on developers seeking permits for priority development projects. The latter is not relevant to our analysis. The authority the County cites, *Clovis Unified*, acknowledges this distinction and undercuts the County's argument. In *Clovis Unified*, community college districts who provided health care services were mandated to provide those services in the future at the level of care they had provided in the 1986-1987 fiscal year. The districts were required to maintain this level of care even if, as they were permitted to do, they eliminated a student health fee they were authorized by statute to charge. Auditing the districts' approved claims for reimbursement under Section 6, the state controller determined the districts would be reimbursed for their health service costs at the level of service they provided in 1986-87 subject to a reduction by the amount of student fees the districts were statutorily authorized to charge, even if the districts chose not to charge the fee. (*Clovis Unified, supra*, 188 Cal.App.4th at pp. 810-811.)

A panel of this court upheld the controller's auditing rule as consistent with section 17556(d).  We stated that section 17556(d)'s fee authority exception to Section 6's subvention requirement embodied a basic principle underlying the state mandate process:  "To the extent a local agency or school district 'has the authority' to charge for the mandated program or increased level of service, that charge cannot be recovered as a state-mandated cost." (*Clovis Unified, supra*, 188 Cal.App.4th at p. 812, fn. omitted.)  In other words, the issue turns on the local agency's authority to levy a fee, not on whether the agency actually imposed the fee.

This holding does not support the County's argument.  The issue raised by the County is not that permittees do not have fee authority.  It is that after they exercise that authority and enact a fee, the fee may not be paid if no developers apply for permits.  The County's authority to levy a fee is not contingent on future developers, only the actual collection of the fee is contingent.  The authority to levy the fee is derived from police power, and nothing in the County's argument, or permittees' arguments, indicates permittees do not have the authority to levy fees for the HMP and the LID requirements.

## DISPOSITION

We reverse the judgment only to the extent it holds that the street sweeping condition is a reimbursable mandate under Section 6.  In all other respects, the judgment is affirmed.  Each party shall bear its own costs.  (Cal. Rules of Court, rule 8.278(a)(5).)

_____

HULL, Acting P. J.

We concur:

_____

MAURO, J.

_____

DUARTE, J.

Filed 11/21/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF FINANCE et al., | C092139 |
| Plaintiffs, Cross-defendants and Appellants, | (Super. Ct. No. 34201080000604CUWMGDS) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| COMMISSION ON STATE MANDATES, | |
| Defendant and Respondent; | |
| COUNTY OF SAN DIEGO et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Laurie M. Earl, J.  Reversed and affirmed.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Anthony R. Hakl and Paul

1

Stein, Supervising Deputy Attorneys General, Nelson R. Richards, Natasha A. Saggar Sheth and Ryan R. Davis, Deputy Attorneys General for Plaintiffs and Appellants.

Best Best & Krieger, Shawn David Hagerty and Rebecca Andrews; Lounsbery Ferguson Altona & Peak, Helen Holmes Peak for Defendants, Cross-complainants, and Appellants City of San Diego et al.; Frederick Michael Ortlieb, Senior Deputy City Attorney for Defendant, Cross-complainant, and Appellant City of San Diego.

Office of County Counsel, Christina Rea Snider, Senior Deputy for Defendant, Cross-complainant, and Appellant County of San Diego.

Camille S. Shelton, Chief Legal Counsel for Defendant and Respondent.


THE COURT:

The opinion in the above-entitled matter filed October 24, 2022, was not certified for publication in the Official Reports and it is so ordered.


BY THE COURT:


_____
HULL, Acting P.J.


_____
MAURO, J.


_____
DUARTE, J.


2